(C.D. 4147)

MATTEL, INC. v. UNITED STATES

## United States Customs Court, First Division

(Decided December 18, 1970)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Earl R. Lidstrom* of counsel) ; *Irell & Manella* (*Richard H. Borow* of counsel) and *R. Kenton Musgrave*, associate counsel; for the plaintiff.

*L. Patrick Gray, III*, Assistant Attorney General (*Velta A. Melnbrencis*, trial attorney), for the defendant.

### Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: This case involves the proper tariff classification of wigs for dolls that were imported from Japan in 1964. They were classified by the government under item 737.20 of the tariff schedules providing for "dolls, and parts of dolls including doll clothing," and assessed with duty at the rate of 35 percent. Plaintiff protests this assessment and claims that the merchandise is properly classifiable under the provision for "wigs" in item 790.70, and thus dutiable at only 14 percent.

The provisions of the tariff schedules with which we are concerned read as follows:

### General Headnotes and Rules of Interpretation

10. General Interpretative Rules.

\*     \*     \*     \*     \*     \*     \*

(ij) *a provision for "parts" of an article* covers a product solely or chiefly used as a part of such article, but *does not prevail over a specific provision for such part.* [Emphasis added.]

Schedule 7, Part 5

### Subpart E. Models; Dolls, Toys, Tricks, Party Favors

Subpart E headnotes:

1. The articles described in the provisions of this subpart (*except parts*) shall be classified in such provisions, whether or not such articles are more specifically provided for elsewhere in the tariff schedules \* \* \*. [Emphasis added.]

Classified under:

737.20   Dolls, and *parts of dolls* including doll cloth-
ing [emphasis added]_____      35% ad val.

Claimed under:

790.70   Wigs, toupees, chignons, and similar articles_      14% ad val.

At the outset, it is to be noted that doll wigs substantially identical to those here were the subject of adjudication in *Mattel, Inc.* v. *United States*, 61 Cust. Ct. 75, 287 F. Supp. 999, C.D. 3531 (1968). In that case, the wigs were classified by the collector under item 737.20 as parts of dolls, while plaintiff claimed—as it does here—that the merchandise was properly classifiable under the *eo nomine* provision for "wigs" in item 790.70. At the trial, the government abandoned and repudiated the collector's classification and claimed a new classification for the wigs under item 737.90 as "[t]oys, * * * not specially provided for * * * [o]ther," dutiable at 35 percent. In addition, the government entered into a stipulation with plaintiff in which it "concede[d] that the articles described as wigs on the invoices are, in fact, wigs, and are described in item 790.70." Since the wigs were thus stipulated to be "wigs" of the type described in item 790.70, if the record established that they were "parts" of dolls, then general interpretative rule 10(ij) and headnote 1 of schedule 7, part 5, subpart E required that the specific provision for wigs in item 790.70 prevail over the "parts" provision. Hence, the single issue in the prior case was whether the wigs were "parts" of dolls, as contended by plaintiff, or mere accessories, as contended by the government. And on that issue, the court held that the wigs were "parts" of dolls and were therefore, by virtue of rule 10(ij), and headnote 1, *supra*, properly classifiable under item 790.70 as "wigs."

In the present case, there is no dispute that the imported doll wigs are "parts" of dolls.[1] The issue, rather, is whether or not the importations are "wigs" within the meaning of item 790.70—which issue (as we have seen) was stipulated by the defendant in the prior case.[2]

On this aspect, plaintiff's position is that the imported doll wigs are included in the common meaning of the term "wigs" as used in item 790.70, while defendant's position is that the term includes only wigs for human wear, and does not include wigs for other than human wear, such as wigs for dolls and wigs for mannequins. For the reasons that follow, we agree with plaintiff and hold that the imported wigs are included in the common meaning of the term "wigs" as used in item 790.70.

---

[1] This is evidenced by the government's classification of the importations under the provision in item 737.20 for parts of dolls—which classification it insists here is correct.

[2] At the pretrial conference in the present case, plaintiff's motion to incorporate the record in the prior case was allowed with the exception of the stipulation in that case that the articles described as "wigs" on the invoice were in fact "wigs" within the meaning of item 790.70.

We start with the basic principle that tariff laws are written in the language of commerce, and that the commercial meaning of tariff terms is presumed to be the same as their common meaning in the absence of a showing that there is a contrary commercial designation. Neither party has asserted a commercial designation for the term "wigs" which is different from the common meaning and hence commercial designation is not an issue in this case. Thus, the meaning of the term "wigs" is controlled by the common meaning of the term. And this common meaning is, of course, "a matter of law to be determined by the court, for which purpose the court may consult dictionaries and other authorities, may receive the testimony of witnesses, which is advisory only, and may rely upon its own knowledge." *Norbert Stryer* v. *United States*, 62 Cust. Ct. 598, 602, C.D. 3831 (1969).

Against this background, the evidence establishes without contradiction that the imported wigs are universally bought, sold and known as "wigs," and that more often than not when the term "wigs" is used with reference to the imported wigs, it is accompanied by descriptive words or phrases such as "for dolls." Thus, the only witness called by the government in the second trial testified on direct examination (R. 300–01) :

Q. During the 40 years that you have been in business, have you sold your *wigs* for other than human wear ?

A. We have manufactured, but that's on special order, *doll wigs* * * *."

Q. Were those *wigs* for dolls constructed in a different fashion ?

A. No, they weren't constructed in a different way. * * * [Emphasis added.]

Clearly this witness understood the term "wigs" to include "doll wigs." Similarly, a government witness who testified at the first trial was certain that the wigs in question are commonly known as "wigs."

Q. Is it [a sample of the wigs in question] known as a wig in your trade ?

A. It is known as a wig, yes, sir. [R. 107]

The testimony of the other witnesses is even more definite. They were unanimous that wigs for dolls or mannequins [3] were and are commonly known as "wigs"; that they had never used or heard anyone else use

---

[3] The evidence concerning wigs for mannequins is significant because mannequins are built to resemble adults and children for display purposes, because the sizes of mannequins' wigs and wigs for humans overlap, and because wigs for mannequins are similar to wigs for dolls. In fact, a great portion of the evidence showed that wigs for mannequins, dolls and people are sometimes constructed the same way.

any term other than "wig" to describe them; and that they were and are included within the dictionary definitions of "wig." Illustrative of such testimony is the following:

James Albert White (R. 164, 169)
Q. By what name do you refer to wigs for dolls?
A. A wig.
Q. Have you ever heard or known of anyone referring to them by any other name?
A. No.

\* \* \* \* \* \* \*

Q. In your opinion \* \* \* do the dictionary definitions of "wig," cover wigs for dolls?
A. Yes.

Allen Stanley Swartz (R. 188–89)
Q. Have you ever known or heard of any wigs for mannequins being referred to by any other name than that of "wigs"?
A. No.

\* \* \* \* \* \* \*

Q. In your opinion, are wigs for mannequins covered by the dictionary definitions of the term "wig"?
A. Yes.

The evidence also established that wigs for dolls have on occasion been made out of human hair, that the size of wigs for human wear and wigs for dolls can overlap, and that wigs for human wear and wigs for dolls are, on occasion, manufactured and sold by the same companies. Moreover, those witnesses who dealt in more than one particular kind of wig testified that they could not respond to an order to purchase or sell "a wig" or "wigs." They would, generally, have to know whether the "wig" or "wigs" were for dolls or mannequins or for wear by men or women or children.

In short, all the evidence establishes that the common meaning of the term 'wigs" includes wigs for dolls (as well as wigs for mannequins, wigs for wear by children, wigs for wear by men, and wigs for wear by women) and none of the evidence even remotely suggests the contrary.

Additionally, the imported wigs fall within the following dictionary definitions:

*Funk & Wagnalls Standard Dictionary* (1910) and *Funk & Wagnalls New "Standard" Dictionary* (1956)—

Wig. 1. A covering for the head, consisting of false hair, interwoven with or united to a kind of cap or network closely fitting to the head, the whole so constructed as to form an imitation of the natural growth or crown of hair; an artificial covering of hair for the head \* \* \*.

*Webster's Second New International Dictionary* (1960)—

Wig: A manufactured covering of hair for the head, made usually of human hair interwoven or united by a kind of network, either imitating a natural growth, or supplying a coiffure, and worn (1) to cover a deficiency of natural hair, (2) for ornament, (3) in the theatrical costume, or, as in Great Britain by judges and barristers as a part of an official or professional dress; a periwig, a peruke.

These definitions do not limit the scope of the term to any particular type of wig. The term is not limited to wigs for wear by humans, nor is there any limitation as to size, style, etc.[4]

The above definitions are made up of several elements. Consistent with these elements, an examination of the samples confirms that the imported wigs for dolls are "a manufactured covering of hair for the head," "consisting of false hair," "interwoven or united by a kind of network," "an artificial covering of hair for the head," "an imitation of the natural growth or crown of hair," and "worn * * * for ornament."

It is true, as defendant points out, that the term "wig" does not necessarily refer to wigs for dolls without descriptive words or phrases (such as "for dolls") identifying the particular wigs as intended for dolls. But that does not mean that the common meaning of the term "wig" cannot include wigs for dolls. The reason why it may be necessary to describe or identify specifically the kind of wig referred to (e.g., wig for a doll) is because the term "wig" refers to various types of wigs, of which wigs for dolls are but one. In other words, it may be necessary to designate or specify "wigs for dolls" or "wigs for mannequins" simply because all forms of wigs are known as wigs and nothing but wigs, and the various types of wigs are distinguished by specifying which kind they are: e.g., wigs for ladies, wigs for men, etc. Further, to suggest, as defendant does, that the term "wig" does not include wigs for dolls or for mannequins on the ground that the term "wig" does not necessarily mean a "wig for dolls" or a "wig for mannequins" is to overlook the fact that neither does it necessarily

---

[4] The U.S. Bureau of Customs has concluded, to like effect, that the term "wigs" as used in item 790.70 was not limited to wigs for wear by humans. For it has "held" that "wigs for * * * manikins" were covered by that item. See U.S. Tariff Commission, *Summaries of Trade and Tariff Information, Schedule 7,* Vol. 8 (1968), p. 87. Since the Bureau of Customs is charged by Congress with administration of the tariff schedules, its interpretation of a provision thereof for administrative rather than litigation purposes is, of course, entitled to weight. See e.g., *United States* v. *Moskowitz,* 170 F. 2d 870, 873 (5th Cir. 1948) ; *Hironimus* v. *Durant,* 168 F. 2d 288, 291 (4th Cir. 1948). It is to be noted that after the decision in the first *Mattel* case, the Bureau indicated that it was of the opinion that the provision for wigs in item 790.70 was "limited to articles for human use and does not contemplate doll wigs." T.D. 69–2 (1968). The Bureau added that "[i]nasmuch as the court [in *Mattel*] did not have an opportunity to decide this particular issue, the application of the principle of the subject case is limited to the specific importation which was the subject of that decision." *Ibid.*

mean a "wig for ladies" or a "wig for men" or a "wig for children." Were this rationale carried to its logical conclusion, it would mean that wigs for ladies, wigs for men, and wigs for children are not "wigs" because they too must be specifically identified with the qualifying words "for ladies," "for men," and "for children." On this basis, the common meaning of the term "wigs" would include nothing because all wigs must be identified as to type.

An additional consideration of importance is that item 790.70, the provision for wigs, is clearly an *eo nomine* provision. The term "wigs" appears in the statute without limitation, and accordingly covers within its scope all forms and types of wigs, including the imported wigs. E.g., *Nootka Packing Co. et al* v. *United States*, 22 CCPA 464, 470, T.D. 47464 (1935) ; *Mattel, Inc.* v. *United States, supra*, 61 Cust. Ct. at 87, note 9, and cases cited.

Defendant, however, insists that several cases support its position that wigs for dolls are not included in the common meaning of the term "wigs." The first such case is *Ross Products, Inc.* v. *United States*, 46 Cust. Ct. 8, C.D. 2226 (1961), in which the court held that "eggcups" are not cups within the common meaning of that term. The basis of the decision was that an "eggcup" (1) does not come within the dictionary definition of a "cup" since it is not used to drink from, is not bowl shaped, and does not have a saucer as a companion piece; (2) can be identified only by the use of the word "egg" preceding "cup"; and (3) is not known, bought or sold by any designation other than as an eggcup. The present case is quite different, however. For one thing, the importations here in question come clearly within the dictionary definitions of a "wig." Further, and most importantly, in *Ross Products* the court noted that "the only witness testified that an eggcup is not a cup and is not bought and sold as such." 46 Cust. Ct. at 13. Here, by contrast, all of the witnesses testified that the wigs at bar are "wigs" and that they are bought and sold as such.

The second case relied on by defendant is *Miller Harness Co., Inc.* v. *United States*, 59 Cust. Ct. 1, 270 F. Supp. 823, C.D. 3053 (1967), which held that currycombs for horses (used to rub and clean horses) were not "combs." The basis of the decision is significant. The court could simply have held that the term "combs" was intended to apply for use by or upon human beings only—which approach would have been consistent with defendant's position here. But the court did not take that approach; instead it concluded (1) that the type of combs Congress had in mind in using that term in the tariff statutes was a straight toothed instrument for adjusting, cleaning and confining or arranging the hair or for adornment; and (2) that currycombs were not shaped like a comb; they were not used as a comb; they were used for different purposes than a comb and could not under any circum-

stances be identified simply as a "comb" without the use of the word "curry." It is clear that if those criteria had been met, a comb for use on a horse would have been just as much a "comb" as a comb for use on human hair. Furthermore, in the present case—unlike *Miller Harness*—the imported wigs are shaped like wigs; they are used as wigs; they are used for the same purposes as wigs; and they are frequently referred to as wigs without use of the word "doll."

Another case relied on by defendant is *C. J. Tower & Sons* v. *United States*, 44 CCPA 41, C.A.D. 634 (1957), in which the court held that corn on the cob was properly classifiable as vegetables in their natural state rather than as "corn." The court did not disagree with the dictionary definitions indicating that corn on the cob is a type of corn but did not consider such definitions controlling. For, as the court pointed out, the long-standing administrative practice was to classify corn on the cob as "vegetables in their natural state" and "[w]hen an ambiguous statute has received administrative construction, continuously followed for a long time, and has been continuously reenacted without substantive change, it is presumed to have been reenacted with the existing construction." 44 CCPA at 44. In the present case, however, we have a statute as to which an administraive construction is favorable to plaintiff (see note 4, *supra*) and which has not been reenacted continuously without substantive change.

*Hedaya Bros.* v. *United States*, 63 Cust. Ct. 146, C.D. 3888 (1969), similarly fails to support defendant's position. There the court held that "a decorative calendar hanging printed on toweling material, having a dowel and a string" was not classifiable as a "towel" because "a towel is a piece of cloth used for wiping or drying" and "the only use of the entire article is as a wall hanging and not as a towel for wiping." Here, of course, the imported wigs are intended for and used as wigs and nothing but wigs.

An additional case cited by defendant in support of its position is *United States* v. *Andrew Fisher Cycle Co., Inc.*, 57 CCPA 102, C.A.D. 986 (1970), which held that bicycle seats were properly described as parts of bicycles and should not be classified as "saddles." The gist of the holding was that the provision for "saddles" is not a specific provision for bicycle seats and rule 10(ij) has no applicability since the term "saddles" had always referred to saddles for horses and the like. In reaching this conclusion, the court pointed out that prior to the enactment of the tariff schedules, it was the practice to classify bicycle seats as parts of bicycles; that the one reported protest claiming they were classifiable as "saddles" was overruled; that the *Tariff Classification Study* was explicitly contrary to the view that bicycle seats were "saddles"; and that other legislative history made the matter free from doubt. In contrast, the present case does not present

long-standing decisions supporting defendant's view; there is (as discussed below) no legislative history contrary to plaintiff's position; and the *Tariff Classification Study* (as is also discussed below) contains no suggestion whatever that the term "wigs" in item 790.70 is limited to wigs for human wear. Moreover, contrary to the situation in *Andrew Fisher*, it would seem clear that the provision for wigs in item 790.70 is a "specific provision" for dolls within the meaning of rule 10(ij). In this connection, the Tariff Commission's *Submitting Report* to the *Tariff Classification Study* (1960) contains the following discussion of rule 10 (ij) (p. 19):

> * * * In some instances, a mere provision for "parts" prevails over much more specific descriptions in the tariff schedules. * * * *In the proposed schedules, specific provision is made for the more usual components of articles.* Under the rule expressed in headnote 10(ij), these specific provisions will prevail over a mere provision for "parts" of a particular article. [Emphasis added.]

It is thus obvious that in the *Tariff Classification Study* the intention was to make "specific provision" for the "more usual components of articles." And in this light, wigs for dolls were (prior to the tariff schedules and the first decision in *Mattel*) considered under the tariff laws to be one of the "more usual components of articles." As pointed out in the U.S. Tariff Commission's *Summaries of Tariff Information*, Vol. 15, Part 2, p. 4 (1948):

> * * * *Doll* heads, *wigs*, eyes, and attachable pieces such as "mama" voices, walking mechanisms, etc., *are among the most common doll parts produced separately.* * * * [Emphasis added.]

Since "[d]oll * * * wigs * * * are among the most common doll parts produced separately," they plainly are among "the more usual components" of dolls for which "specific provision" was made in the tariff schedules and for which rule 10(ij) was designed to apply. Hence, for this reason as well, defendant's reliance on *Andrew Fisher* is misplaced.

We turn now to the legislative history of item 790.70 and find therein no indication that Congress intended to exclude doll wigs from the provision for "wigs." The *Tariff Classification Study, Schedule 7*, p. 473 (1960), describes the articles of item 790.70 as follows:

> Item 790.70 is a provision for wigs, toupees, chignons, and similar articles at the rate of 17.5 percent ad valorem. This rate is derived from the provision in paragraph 1523 for manufactures of human hair or of which human hair is the component material of chief value not specially provided for, under which the bulk of imports of these articles are now dutiable. Many of these articles are now made of synthetic fibers, and such articles when imported are dutiable at the same rate as those of human hair by virtue of the similitude provisions of paragraph 1559. The articles

named in item 790.70 are virtually the only articles imported under the provision in paragraph 1523 for manufactures of human hair.

It should be noted from the foregoing that there is a complete absence of any indication that the provision for "wigs" was limited in any manner. Neither size, type, value nor material was made a factor. Thus, any suggestion by defendant that the provision is limited to wigs designed for human wear has no support in the statements made by the Tariff Commission.[5]

In addition to these considerations, plaintiff argues strenuously that the *Standard Industrial Classification Manual* supports its position, while defendant argues—equally strenuously—that its position is supported by the *Brussels Nomenclature*. In view of the amount of attention the parties have given to this matter, we deem it appropriate to consider their respective contentions. Preliminarily, it is to be noted that the Tariff Commission, in the *Tariff Classification Study, Submiting Report*, p. 8 (1960), stated that "[t]he 'Brussels Nomenclature' and the 'Standard Industrial Classification Manual' exerted the greatest influence on the arrangement of the proposed revised schedules." Thus, each of these publications "is a useful and helpful source of legislative history with respect to the tariff schedules when a nexus can be found between it and the tariff schedule provisions by the use of identical or similar phraseology. * * * On the other hand where the order, language and phraseology * * * differ from the provisions

---

[5] Two cases involving doll wigs have been decided under previous tariff acts—*Geo. Borgfeldt & Co.* v. *United States,* 19 Treas. Dec. 64, T.D. 30393 (1910), and *Gibbs & Co.* v. *United States,* 47 Treas. Dec. 1059, Abstract 49359 (1925). However, neither is helpful in resolving the issue before us here. In *Borgfeldt*—which defendant relies on—the court held that wigs for dolls were properly classifiable as parts of dolls under the Tariff Act of 1909 rather than as a manufacture of wool. Rule 10(ij) was, of course, not in existence at that time and the case is quite irrelevant. But even were a provision such as rule 10(ij) applicable, a basket provision such as one covering manufactures of wool would scarcely be the type of "specific provision" that would invoke the operation of that rule. See *Ideal Toy Corporation* v. *United States,* 58 CCPA —, C.A.D. 996, slip op. Oct. 29, 1970 at 8. *Gibbs*—relied on by plaintiff—likewise has little precedent value for our purposes. Involved in *Gibbs* were small wigs which the importer contended were used on foot-high window display figures and of a type which the examining customs officer had seen on dolls. The imported wigs were classified as parts of dolls and claimed dutiable as manufactures of human hair. The Board of General Appraisers stated that it could not "sustain the collector in his classification of this wig as a toy" but that since proof was lacking that the component material was in chief value of hair, it had to overrule the protest. Plaintiff asserts that this is an indication that the Board would have held that such wigs were classifiable as claimed if there had been evidence in the record of component material of chief value. From this, plaintiff draws the conclusion that as far back as 1925 small wigs would have been classified under the predecessor provision of item 790.70—i.e., manufactures of human hair—even if they were not of the type of wigs worn by humans. The difficulty with the argument is that the Board did not find that the imported small wigs were properly classifiable under the claimed provision, and hence any indication by it that the wigs would have been classified as claimed had component material of chief value been shown is mere dictum.

of the tariff schedules * * * [it] does not serve as a guide to the intention of Congress." *M. Hohner, Inc.* v. *United States*, 63 Cust. Ct. 496, 500–01, C.D. 3942 (1969). See also e.g., *Hollywood Accessories, Division of Allen Electronics & Equip. Co.* v. *United States*, 60 Cust. Ct. 360, 367, 282 F. Supp. 499, 504, C.D. 3391 (1968); *W. R. Filbin & Co., Inc.* v. *United States*, 63 Cust. Ct. 200, 306 F. Supp. 440, C.D. 3897 (1969). *Cf. F. L. Smidth & Company* v. *United States*, 56 CCPA 77, 83–84, 409 F. 2d 1369, 1375, C.A.D. 958 (1969).

In this context, plaintiff relies on the *Standard Industrial Classification Manual* (hereafter referred to as the *"Manual"*) whose alphabetical index of the manufacturing industries has the following pertinent entries:

| Industry No. | Item |
|---|---|
| 3999 | Wigs, *including doll wigs* [Emphasis added.] |
| 3999 | Doll wigs (hair) |
| 3942 | Dolls, doll parts, and doll clothing *except wigs* [Emphasis added.] |
| 3999 | Hair goods: braids, nets, switches, toupees, wigs, etc. |

Industry No. 3999, "Manufacturing industries, not elsewhere classified," includes establishments primarily engaged in manufacturing miscellaneous fabricated products including, among other things, hair work. *Manual*, 1957, p. 121. Industry No. 3942, "Dolls," includes establishments primarily engaged in manufacturing dolls, doll parts, and doll clothing. *Manual*, 1957, p. 119.

It is apparent from the foregoing that "dolls' wigs" are to be classified as "wigs" and, more particularly, are excluded from the category of products described in the *Manual* as "dolls" and "doll parts." However, the language of item 790.70 is quite different from the entries for Industry No. 3999. Thus, item 790.70 covers "Wigs, toupees, chignons, and similar articles," while Industry No. 3999 covers "Hair goods: braids, nets, switches, toupees, wigs, etc." Moreover, item 737.20 covers "Dolls, and parts of dolls including doll clothing," while Industry No. 3942 covers "Dolls, doll parts, and doll clothing except wigs." [6] Thus, item 737.20 treats doll parts and doll clothing in a single category, whereas the *Manual* considers them as two separate items. In light of these several considerations, the *Manual* cannot be considered as a useful guide to the intention of Congress in adopting item 790.70 or item 737.20.

---

[6] On this latter aspect, it is plain that item 737.20 simply repeated the provisions of paragraph 1513 of the Tariff Act of 1930 which read "all other dolls, parts of dolls (including clothing) * * *."

Nor does the *Brussels Nomenclature*—on which defendant relies—stand on any better footing. Its heading 67.04 covers:

WIGS, FALSE BEARDS, HAIR PADS, CURLS, SWITCHES AND THE LIKE, OF HUMAN OR ANIMAL HAIR OR OF TEXTILES: OTHER ARTICLES OF HUMAN HAIR (INCLUDING HAIR NETS).

The explanatory notes to this category 67.04 read as follows:

> * * * These articles include wigs, curls, switches, chignons, false eyebrows and eyelashes, beards, whiskers, moustaches, etc. They are usually of high-class workmanship intended for serious use either as aids to personal toilet or for professional work (e.g., theatrical wigs).

Specifically excluded from this category are "dolls' wigs" which are to be classified under heading 97.02, the explanatory notes to which state that *parts* and accessories of dolls falling within this heading include wigs.

On the basis of the foregoing, it is apparent that the *Brussels Nomenclature* is quite different from the tariff schedules with respect to wigs for dolls. In the first place, the language of the sections is quite different. Second, the classification scheme is different too. For the *Brussels Nomenclature* does not have the equivalent of headnote 1 which precedes item 737.20 of the tariff schedules nor the equivalent of General Headnote, Rule 10(ij), both of which we held in the prior case to mean that wigs that are "parts of dolls" are classified as "wigs." This very substantial difference between the language and scheme of the tariff schedules, on the one hand, and the *Brussels Nomenclature*, on the other, necessarily means that the *Brussels Nomenclature* cannot be used in this case as an indicator of Congressional intent. And this is particularly true in view of the contrary classification set forth in the *Standard Industrial Classification Manual*.

Finally, defendant argues that assuming *arguendo* that some doll wigs may be considered "wigs," the importations have certain characteristics which prevent them from being similarly considered. For one thing, defendant says, the importations were patented. This is a *non sequitur*. The fact that these wigs are patented is entirely irrelevant to the common meaning of "wigs." Certainly, patented engines are "engines," and patented tools are "tools." Next, defendant relies on the fact that the wigs in question were not sold separately but only with a doll or doll head, and that they were pre-styled and set and could not effectively be recombed. The relevance of these factors is not clear. In any event, there is no evidence that all wigs for human

wear are not pre-styled and set and can be effectively recombed. Furthermore, the fact that the imported wigs were sold with other merchandise cannot conceivably bear upon the common meaning of "wigs." Thus, if a particular kind of radio is sold only in a particular automobile, it is still a radio. Another reason given by defendant as to why the importations should not be termed "wigs" is that they "were not designed to cover an existing hair piece that was rooted in a doll's head." But under this rationale, wigs designed especially for bald people could not be considered wigs either. Also, defendant says that the importations are not "wigs" because they "were not designed to be worn on a head." We have some difficulty in understanding this statement. For upon what were the wigs designed to be worn if not upon a head—i.e., a doll's head? As we observed in the prior case: "[T]he wigs, of course, were designed and intended specifically to be used on the patented 'Fashion Queen Barbie' doll head." 61 Cust. Ct. at 85. Additionally, defendant says, because of the construction of the importations, "[e]ven if * * * [they] were in human size, because of lack of breathing and ventilation they would be too warm and impractical for human wear * * * [and] [a]t best * * * could only be worn at masquerades." But as we have seen, whether or not the imported wigs could be worn by humans is immaterial. Furthermore, considering that defendant concedes that the importations could if in human size "be worn at masquerades," it may be pointed out that "wigs for human wear"—which defendant argues is the only definition of "wigs"— includes "masquerade wigs." Thus a witness testified that he manufactures many kinds of wigs, including "masquerade wigs" which he sells to children and adults.

We hold, in summary, that the imported wigs for dolls are "wigs" within the meaning of item 790.70. In that circumstance, rule 10(ij) and headnote 1 of schedule 7, part 5, subpart E require that they be classified under that item rather than under item 737.20 as parts of dolls. The protest is sustained and judgment will be entered to that effect.[7]

---

[7] In view of this conclusion, we need not consider plaintiff's additional contentions (1) that the government's stipulation in the prior case that "the articles described on the invoices are, in fact, wigs" constitutes an admission against interest in the present case; and (2) that *res judicata* or *stare decisis* requires the decision in the previous case—that the imported wigs are classifiable under item 790.70—to be controlling.